UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA EX. REL. J.
MICHAEL MASTEJ,

                Plaintiffs,

vs.                    Case No.  2:11-cv-89-FtM-29DNF

HEALTH MANAGEMENT ASSOCIATES, INC.
AND NAPLES HMA, LLC,

                Defendants.
_____

**OPINION AND ORDER**

This matter comes before the Court on Defendants' Joint Motion to Dismiss the Third Amended Complaint (Doc. #84) filed on March 26, 2012.  Relator filed a Memorandum of Law in Opposition on April 9, 2012.  (Doc. #85.)  With leave of Court (Doc. #87), defendants filed a Reply Brief on April 30, 2012.  (Doc. #88.)  For the reasons set forth below, the motion to dismiss is granted.

**I.**

Michael Mastej (Mastej or relator) brings this *qui tam* action asserting violations of the False Claims Act, 31 U.S.C. § 3729 *et. seq.* (FCA).  The Court previously dismissed Mastej's Second Amended Complaint because it failed to meet the heightened pleading standards set forth in Fed. R. Civ. P. 9(b) and lacked an "indicia of reliability".  (See generally, Doc. #78.)  The same Opinion and

Order granted relator leave to file an amended complaint, and Mastej filed his Third Amended Complaint (Doc. #79) on March 8, 2012.

The Third Amended Complaint asserts four causes of action under the False Claims Act: (1) presentation of false claims (Count I); (2) making or using a false record or statement to cause a claim to be paid (Count II); (3) making or using a false record or statement to avoid an obligation or refund (Count III); and (4) conspiring to submit false claims (Count IV). Defendants Health Management Associates, Inc. (HMA) and Naples HMA, LLC (Naples HMA) (collectively, defendants) seek to dismiss the Third Amended Complaint with prejudice because it still fails to meet the heightened pleading requirements of Rule 9(b). Defendants also seek to dismiss a portion of the counts based upon a release contained in an employment severance agreement.

## II.

A relator asserting an FCA claim is required to comply with both the usual pleading requirements of Fed. R. Civ. P. 8 and the heightened pleadings requirements set forth in Fed. R. Civ. P. 9(b). As the Eleventh Circuit recently summarized:

> At the pleading stage, a complaint alleging violations of the FCA must satisfy two pleading requirements. First, the complaint must provide a short and plain statement of the claim showing that the pleader is entitled to relief. A complaint cannot merely recite the elements of a cause of action but must contain factual allegations sufficient to raise the right to relief above the speculative level. Second, a complaint must comply with Rule 9(b)'s

heightened pleading standard, which requires a party to state with particularity the circumstances constituting fraud or mistake.  The purpose of Rule 9(b) is to alert defendants to the precise misconduct with which they are charged and protect[ ] defendants against spurious charges. . . .

The particularity requirement of Rule 9(b) is satisfied if the complaint alleges facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them.

U.S. ex rel. Matheny v. Medco Health Solutions, Inc., 671 F.3d 1217, 1222 (11th Cir. 2012)(quotation marks and internal citations omitted). See also United States ex rel. Sanchez v. Lymphatx, Inc., 596 F.3d 1300, 1302 (11th Cir. 2010); Hopper v. Solvay Pharmaceuticals, Inc., 588 F.3d 1318, 1324-27 (11th Cir. 2009); United States ex rel. Clausen v. Lab. Corp. Of Am., 290 F.3d 1301, 1310 (11th Cir. 2002).  Failure to satisfy Rule 9(b) is grounds to dismiss a complaint.  Corsello v. Lincare, Inc., 428 F.3d 1008, 1012 (11th Cir. 2005).

In deciding a Rule 12(b)(6) motion to dismiss, the Court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff, Erickson v. Pardus, 551 U.S. 89 (2007), but "[l]egal conclusions without adequate factual support are entitled to no assumption of truth," Mamani v. Berzain, 654 F.3d 1148, 1153 (11th Cir. 2011)(citations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  "Factual allegations that are

-3-

merely consistent with a defendant's liability fall short of being facially plausible." Chaparro v. Carnival Corp., 693 F.3d 1333, 1337 (11th Cir. 2012)(internal quotation marks and citations omitted).  Thus, under Rule 8 the Court engages in a two-step approach: "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679.

## III.

The Third Amended Complaint alleges the following pertinent facts and information:

Defendant HMA is an incorporated entity which has various subsidiaries and operates approximately fifty-six (56) hospitals in fifteen (15) states. (Doc. #79, ¶57.)  Defendant Naples HMA is a HMA subsidiary doing business as "Physicians Regional Medical Center." (Id. at ¶58, 60.)  Physicians Regional Medical Center operates two campuses: (1) Physicians Regional Medical Center, Collier Boulevard (Collier Boulevard Facility) and (2) Physicians Regional Medical Center, Pine Ridge (Pine Ridge Facility). (Id. at ¶60.)  Relator was employed in various capacities by defendant HMA or its subsidiaries from January, 2001 through October, 2007. (Id. at ¶¶60-63).  Relator was Chief Executive Officer (CEO) of the Collier Boulevard Facility from February 5, 2007, to October, 2007.

Two government healthcare programs - Medicare and Medicaid -

are relevant to the allegations in this case.   The Third Amended Complaint describes these programs and the claims procedures as follows:

**Medicare:**   The United States pays for the costs of certain healthcare services under   Medicare (Id. at ¶24), and most hospitals, including Physicians Regional Medical Center, derive a portion of their revenue from this program. (Id. at ¶25.)   The United States administers and supervises the Medicare program through the Department of Health and Human Services, currently through the Centers for Medicare and Medicaid Services (CMS). (Id. at ¶¶27.)  Medicare enters into provider agreements with hospitals to establish the hospital's eligibility to participate. (Id. at ¶27.)   After patients receive eligible items and services, the participating hospitals submit patient-specific claims for interim reimbursement, and CMS makes payments to the hospitals based upon the interim claims.  (Id. at ¶¶27, 28.)

Hospitals are required to submit an annual Hospital Cost Report, which is essentially a reckoning of whether the hospital is entitled to additional Medicare payments or if there has been an overpayment (which requires reimbursement by the hospital to the government) during the prior fiscal year.  (Id. at ¶¶29-31.)   At all relevant times, defendants submitted both interim claims and Hospital Cost Reports to the appropriate government agency. (Id. at ¶33.)

Every Hospital Cost Report contains a notification that "IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WHERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT." (Id. at ¶35.)  Additionally, the Hospital Cost Reports contains a "Certification" attesting to the accuracy of the Hospital Cost Report and that the signor is "familiar with the laws and regulations regarding the provision of health care services and that the services identified in this cost report were provided in compliance with such laws and regulations." (Id.)   Three relevant Hospital Cost Reports that are signed, certified, and submitted by defendants to Medicare are identified as follows:

   (1)   Hospital Cost Report signed on or about May 30, 2008, by Geoff Moebius for the period January 1, 2007, to December 31, 2007;

   (2)   Hospital Cost Report signed on or about June 7, 2010, by Todd Lupton for the period January 1, 2008, to December 31, 2008; and

   (3)   Hospital Cost Report signed on or about May 26, 2010, by Todd Lupton for the period January 1, 2009, to December 31, 2009.

(Id. at ¶36.)

**Medicaid:**  Medicaid is a joint federal-state program which provides healthcare benefits primarily for the poor and disabled. (Id. at ¶42.)   The federal role primarily involves providing matching funds through federal financial participation (FFP) and ensuring compliance with minimum standards.   (Id. at ¶¶ 42-43.) Participating hospitals in Florida file an annual Medicaid cost report with the state agency, which includes a copy of the hospital's Medicare cost report.   (Id. at ¶¶44-45.)   Hospitals provide the "same type of financial data" in the Medicaid cost reports as provided in the Medicare cost reports.   (Id. at ¶46.) Information in the Medicaid cost reports is used to determine the amount of reimbursement each facility may receive based on the proportion of its cost equal to the proportion of Medicaid patients in the facility.   (Id. at ¶49.)   The Medicaid cost reports include a certification that the hospital is familiar with the Medicaid laws and regulations regarding providing health care services and claims for Medicaid reimbursement and payment, "AND THAT THE SERVICES IDENTIFIED IN THIS COST REPORT WERE PROVIDED IN COMPLIANCE WITH SUCH LAWS AND REGULATIONS."  (Id. at ¶50.)   Three relevant Medicaid certifications that are signed, certified, and submitted by defendants to the appropriate state agency are identified as follows:

(1)   Certification signed on or about May 30, 2008, by Geoff Moebius for the period January 1, 2007, to December 31, 2007;

(2)   Certification signed on or about June 7, 2010, by Todd Lupton for the period January 1, 2008, to December 31, 2008; and

(3)   Certification signed on or about May 26, 2010, by Todd Lupton for the period January 1, 2009, to December 31, 2009.

(Id. at ¶51.)

The Third Amended Complaint describes defendants' offending conduct as follows:

**Schemes to Defraud:**  As rewards for referring patients or as inducements for future patient referrals, defendants established prohibited, non-exempt financial relationships with physicians who referred Medicare and Medicaid (as well as other) patients to the Collier Boulevard Facility and the Pine Ridge Facility.  (Id. at ¶64.) Based upon the financial relationship, these rewarded physicians referred Medicare and Medicaid patients to both facilities for services.  (Id.)  Healthcare services were rendered to such patients, and defendants sought and received payment for such services from Medicare and Medicaid. (Id.)  Relator describes

-8-

two financial relationship schemes, which he asserts violated the Stark Statute[1] and the Anti-Kickback Statute[2]. (Id. at ¶¶ 64-86.)

**A. Overpayment For Neurosurgery Call Coverage:** Despite the fact that the Collier Boulevard Facility did not offer emergency neurosurgery services at all, and the Pine Ridge Facility did not offer emergency neurosurgery services from 2007 to 2009, Geoff Moebius (Moebius), the CEO of the Pine Ridge Facility, negotiated call coverage contracts with five neurosurgeons. (Id. at ¶¶ 66-67.) Pursuant to the call coverage contracts, each neurosurgeon was paid $1,000 for each weekday, and $2,000 for each weekend, on which call coverage was provided. (Id. at ¶67.) The Third Amended Complaint alleges that these call coverage agreements were illegal remuneration and/or a prohibited financial relationship to entice the neurosurgeons to practice at and refer patients to both facilities. (Id. at ¶68.) The neurosurgeons did refer Medicare and Medicaid patients to both facilities for treatment, and claims were submitted to the government for services provided by the

---

[1] 42 U.S.C. § 1395nn, commonly referred to as the Stark Law, the Stark Statute, or the Stark Amendment, prohibits a hospital from submitting Medicare or Medicaid claims based on patient referrals from physicians having certain kinds of financial relationships with the hospital that might improperly influence the physician's medical judgment.

[2] The Anti-Kickback Statute makes it a felony to offer kickbacks or other payments in exchange for referring patients "for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2)(A).

neurosurgeons. (<u>Id.</u> at ¶69.) Such claims were false because of the illegal overpayment scheme. (<u>Id.</u> at ¶69.) It is also alleged that the call contract amounts were significantly above fair market value and not commercially reasonable, and for this reason constituted illegal remuneration and kickbacks. (<u>Id.</u> at ¶70.)

**B. Masters Golf Tournament:** The Third Amended Complaint alleges that in 2008, defendants conspired to provide improper remuneration and/or enter into prohibited financial relationships with several physicians for the purpose of generating patient referrals (including Medicare and Medicaid patients) for HMA hospitals, particularly the Collier Boulevard Facility. (<u>Id.</u> at ¶¶ 73, 74.) This scheme involved flying four (4) specifically identified physicians in HMA's corporate jet to the April, 2008 Masters Golf Tournament in Augusta, Georgia at no cost to the physicians; providing the physicians with a free car rental while in Augusta; providing free all-access badges to the Masters Tournament; and giving the physicians free food and drink. (<u>Id.</u> at ¶73.) Defendants selected the physicians based on their ability and willingness to send patient referrals to HMA hospitals. (<u>Id.</u>) Each physician was placed on a separate flight accompanied by a hospital administrator who discussed having the physician engage in additional business with the Collier Boulevard Facility. (<u>Id.</u> at ¶74.) Following the Masters Tournament, the physicians "referred Medicare and Medicaid patients (and other patients) for treatment

at Pine Ridge and Collier Boulevard, for which Defendants systematically submitted false and illegal claims to the Government under the Medicare and Medicaid programs." (<u>Id.</u> at ¶75.) This constituted a financial relationship and implicated the prohibitions of the Stark Statute. (<u>Id.</u> at ¶76.)

**FCA Violations:** The Third Amended Complaint asserts that defendants have committed three (3) violations of the FCA based upon three distinct courses of conduct: (1) submission of Medicare and Medicaid claims in violation of the Stark Statute; (2) submission of Medicare and Medicaid claims in violation of the Anti-Kickback Statute; and (3) false certification of all their Medicare and Medicaid services rendered and billed to the government. (<u>Id.</u> at ¶¶ 71, 79.) The Third Amended Complaint alleges that each of the three Medicare hospital cost reports and each of the three Medicaid hospital cost reports falsely represented that defendants were in compliance with healthcare regulations and laws, when in fact defendants had violated the Stark Statute and the Anti-Kickback Statute. (<u>Id.</u> at ¶¶39, 53.) Defendants were in fact paid for their services (<u>Id.</u> at ¶¶40, 53, 55-56), and these misrepresentations are alleged to have been material to the decision of the government to pay for defendants' services. (<u>Id.</u> at ¶¶40, 53.) Each Medicare and Medicaid hospital cost report is alleged to constitute a false claim to the government. (<u>Id.</u> at ¶¶41, 52, 54, 70.) The Third Amended

-11-

Complaint also asserts that each interim claim submitted to the government was fraudulent and a separate violation of the FCA. (Id. at ¶¶85-86.)

The Third Amended Complaint further asserts that the two improper financial relationship schemes with the rewarded physicians triggered the referral and payment prohibitions of the Stark Statute as to designated health services ordered, referred, or arranged by those physicians. Relator alleges that defendants were therefore prohibited from submitting claims for payment for such services and collecting payment for such services, and were required to promptly refund any amounts they collected for such services. Defendants knowingly submitted, collected, and refused to refund payments made for services ineligible for submission or payment under the Medicare and Medicaid programs and falsely certified compliance with applicable statutes, which included the Stark and Anti-Kickback laws. Because of the schemes, the government paid for services for which it was not legally obligated, regardless of the medical necessity or quality of the services rendered. (Id. at ¶¶ 71-72, 79-80, 81-86.)

**IV.**

Both defendants seek dismissal of all counts for failing to adequately plead any cause of action under the FCA. While the Court will address each count in sequence, it is useful to first note what this case does not involve. "Medicare claims may be

false if they claim reimbursement for services or costs that either are not reimbursable or were not rendered as claimed." R&F Properties, 433 F.3d at 1256.  This case involves only the former. The Third Amended Complaint does not assert that the on-call neurosurgeons did not provide the services for which they were compensated, i.e., that they were not actually on call. Additionally, it does not assert that any claimed health care service was not needed or provided, or that the costs were not as represented.  Indeed, the Third Amended Complaint asserts that the medical necessity and quality of the healthcare service are not relevant to the counts.  (Doc. #79, ¶¶71-72, 79-80, 81-86.) Additionally, the Third Amended Complaint does not allege that defendants submitted claims for reimbursement of the costs of hiring the on-call neurosurgeons or the cost of the Masters Golf gratuities.

Rather, relator's theory is that even though proper healthcare services were provided to actual patients in need, the government was not obligated to pay for the services because the claim forms submitted to the government contained the false certification that all services had been provided in conformity with law and regulation, when in fact the patients had been referred as the result of financial arrangements with physicians which violated the Stark Statute and/or the Anti-Kickback Statute.  This "taint" of

the false certification is asserted to have rendered the claim forms to be false under the FCA.

## A.  Count I - Presentment of False Claims For Payment

After incorporating all prior paragraphs, Count I alleges that defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States. (Id. at ¶100.)  These false claims "includ[ed] claims for reimbursement for services rendered to patients unlawfully referred to HMA facilities by physicians to whom Defendants provided kickbacks and/or illegal remuneration and/or with whom Defendants entered into prohibited financial relationships, in violation of the Anti-Kickback Statute and/or the Stark Statute." (Id.)  Count I further alleges that by virtue of the false or fraudulent claims made by Defendants, the Government suffered unspecified damages. (Id. at ¶101.)  Count I seeks treble damages, plus a civil penalty of $5,500 to $11,000 for each violation.  (Id.)

Count I alleges a violation of the "presentment clause" of the FCA.  Two versions of this provision of the FCA are applicable to the conduct in Count I.  Before May 20, 2009, the statute imposed civil liability on any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; . . ."  31 U.S.C. § 3729(a)(1).  Effective May 20, 2009, the statute was

-14-

amended to impose civil liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; . . ." 31 U.S.C. § 3729(a)(1)(A). A "claim" was defined to include a request for money that is presented to an officer, employee or agent of the United States. Id. at § 3729(b)(2)(A)(I). No material substantive differences exist between these versions of the statute.

"To establish a cause of action under the [presentment clause of the] False Claims Act, a relator must prove three elements: (1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false. 31 U.S.C. § 3729(a)." R&F Properties of Lake Cnty., Inc., 433 F.3d at 1355. See also Hooper v. Lockheed Martin Corp., 688 F.3d 1037, 1047 (9th Cir. 2012)("to establish a cause of action under § 3729(a)(1)(A), the United States or relator must prove the following elements: (1) a false or fraudulent claim (2) that was material to the decision-making process (3) which defendant presented, or caused to be presented, to the United States for payment or approval (4) with knowledge that the claim was false or fraudulent."). The falsity must also be material to the claim. Liams v. Renal Care Grp., Inc., 696 F.3d 518, 528 (6th Cir. 2012).

It is first necessary to determine the presentment(s) which are the subject of Count I. Without the presentment of a false

claim, "there is simply no actionable damage to the public fisc as required under the False Claims Act" even if the entity's practices are unwise or improper. <u>Clausen</u>, 290 F.3d at 1311; <u>Hopper</u>, 588 F.3d at 1325.  In other words, "a claim actually must have been submitted to the federal government for reimbursement, . . ." <u>Nathan v. Takeda Pharm. N.A., Inc.</u>, ---F.3d----, 2013 WL 136030 (4th Cir. Jan. 11, 2013).  When a relator fails to plead plausible allegations of presentment, he has not alleged all the elements of a presentment claim under the FCA.  <u>Nathan</u>, 2013 WL 136030 at *4, citing <u>Clausen</u>, 290 F.3d at 1313.

"Rule 9(b) requires that actual presentment of a claim be pled with particularity." <u>Hopper</u>, 588 F.3d at 1326.  "In order to plead the submission of a false claim with particularity, a relator must identify the particular document and statement alleged to be false, who made or used it, when the statement was made, how the statement was false, and what the defendants obtained as a result." <u>Matheny</u>, 671 F.3d at 1225.   The particularity requirement of Rule 9(b) "does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." <u>Clausen</u>, 290 F.3d at 1311. Rather, Rule 9(b) requires that "some indicia of reliability" must be provided in the complaint to support the allegation that an

-16-

actual false claim was presented to the government. Id.  Without
such plausible allegations of presentment, a relator not only fails
to meet the particularity requirement of Rule 9(b), but also does
not satisfy the general plausibility standard of Iqbal.  Clausen,
290 F.3d at 1313.  Whether factual allegations satisfy this
standard is determined on a case by case basis.  Atkins, 470 F.3d
at 1358.  The Eleventh Circuit has discussed the sufficiency of a
pleading in a presentment claim context in six published cases, two
of which found allegations sufficient, Walker and McNutt ex rel.
U.S. v. Haleyville Med. Supplies, Inc., 423 F.3d 1256, 1259 (11th
Cir. 2005), and four of which found them insufficient, Clausen,
Corsello, Atkins, and Hopper.

As discussed above, the Third Amended Complaint identifies the
presentments as being (1) each individual patient-specific interim
claim for payment of Medicare or Medicaid services submitted by
defendants; (2) the three specifically-identified Medicare Hospital
Cost Reports; and (3) the three specifically-identified Medicaid
Cost Reports.  The Court will address each in turn.

**(1)   Interim Claims:**   While the Third Amended Complaint
asserts that each interim Medicare claim submitted by defendants
constitute a false claim under the FCA (Doc. #79, ¶¶85, 86), it
makes no attempt to identify such presentments.  The Third Amended
Complaint identifies not a single patient, nor a single interim
claim form, nor a single certification which it asserts was

rendered false by the two schemes with referring physicians. Literally no specific information is provided about the submission of interim claim forms, including who submitted the forms, when they were submitted, which patients' forms were involved, or what defendants received as a result. Thus, the Third Amended Complaint "fail[s] to provide any specific details regarding either the dates on or the frequency with which the defendants submitted false claims, the amounts of those claims, or the patients whose treatment served as the basis for the claims." Sanchez, 596 F.3d at 1302. Without the "'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions to the government," the Third Amended Complaint fails to satisfy Rule 9(b). Hopper, 588 F.3d at 1326-27. Therefore, to the extent that Count I relies upon any interim Medicare or Medicaid claim, it fails to sufficiently state a cause of action upon which relief may be granted, and that portion of Count I is dismissed with prejudice.

(2) **Medicare and Medicaid Hospital Cost Reports:** The Third Amended Complaint asserts that the three Medicaid Cost Reports and the three Medicare Hospital Cost Reports each qualify as presentments of false claims. The Third Amended Complaint sufficiently identifies the type of documents submitted, the dates of the presentments, the time period the claims covered, and who signed the claim forms. The Third Amended Complaint fails, however, to adequately allege which portions of the claim forms

were false and what defendants gained as a result of the false claims.

**(a)   Calender Year 2007 Claims:**   Two separate forms were filed on May 30, 2008, both covering calendar year 2007 - the Medicare Hospital Cost Report and the Medicaid Hospital Cost Report.  Neither report can be false because of the Masters Golf gratuities; that event did not take place until April, 2008, and these reports only covered calendar year 2007.  Therefore Count I is dismissed with prejudice to the extent that Count I incorporates the Masters Golf allegations to establish false 2007 claims.

The sole remaining basis upon which the 2007 claim could be found false is the allegation that paying the five on-call neurosurgeons violated the Anti-Kickback Statute and/or Stark Law, and therefore rendered the claim and the compliance certification false.  Violating the Anti-Kickback Statute or the Stark Amendment does not in and of itself create liability under the FCA, because the FCA "does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies . . ." Clausen, 290 F.3d at 1311.  Compliance with the health care laws, however, is a condition of payment by the Medicare program, and non-compliance disqualifies a claimant from receiving such payments.  McNutt ex rel. U.S. v. Haleyville Med. Supplies, Inc., 423 F.3d 1256, 1259 (11th Cir. 2005).  A claimant who violates the health care laws and then submits a claim to

Medicare for which payment is known not to be owed submits a false claim under the presentation clause of the FCA.  McNutt, 423 F.3d at 1259; Clausen, 290 F.3d at 1311.  Further, falsely certifying compliance with the health care laws also provides a basis for liability under the presentment clause.

The Third Amended Complaint alleges that in calendar year 2007, defendants paid five neurosurgeons to be on-call either when they were not needed or at an inflated cost; that these payments were made in order to induce patient referrals by the five neurosurgeons; that these neurosurgeons then did make Medicare and Medicaid referrals to the hospitals; and that the hospitals performed services, billed Medicare or Medicaid for the services, and were paid by Medicare or Medicaid.  While the Third Amended Complaint identifies the forms submitted, it fails to specifically identify a single patient referred by the neurosurgeons for whom services were provided by defendants in 2007; fails to identify a single referred patient whose services were included in the 2007 hospital cost reports (both Medicare and Medicaid); fails to identify the individual or cumulative amounts involved in the claims submitted in reference to referred patients; and fails to reasonably identify what defendants gained as a result of the 2007 misconduct.  This is unlike McNutt, where the complaint identified numerous specific claims submitted to Medicare for reimbursement for services which had been rendered to patients referred by the

individuals receiving kickbacks.  423 F.3d at 1258, 1260.  It is also unlike Matheny, where the relators pled specific dollar amounts gained by the defendants ($62 million in overpayments from insufficient documentation and $7 million in overpayments resulting from duplicate billings and other errors).  Here, Mastej simply makes general allegations that the defendants were financially enriched (See e.g. Doc. #79, ¶¶ 83,85), and provides a theoretical formula for the government to calculate damages.  (Doc. #79, p. 35.)

This is not enough to comply with the heightened pleading standards of Rule 9.  Nonetheless, the Eleventh Circuit has recognized the difficulty in FCA cases with pleading with the requisite specificity.  Accordingly, where a Complaint fails to meet the specificity standards required by Rule 9, the matter will nevertheless be permitted to go forward where the complaint has some "indicia of reliability" to excuse the failure.  Clausen, 290 F.3d at 1311.  In addressing the Second Amended Complaint, the Court found that the relator had failed to plead sufficient facts to give rise to the "indicia of reliability" exception.

In an apparent attempt to come within the pleading exception, in his Third Amended Complaint relator has added allegations related to financial meetings he attended.  Accepting these allegations as true, for the month of January 2007, and possibly

-21-

the first week of February 2007, relator worked as Vice President

of Acquisitions and Development for HMA and attended:

> weekly case management meetings in which Medicare and
> Medicaid patients and billing were discussed. *Because*
> *every patient was reviewed, including how the services*
> *were being billed to each patient*, Relator is intimately
> familiar with the payor mix at the hospitals.  Relator is
> also specifically aware that the doctors and medical
> groups at issue in this case referred Medicare and
> Medicaid patients for service at Collier Boulevard and
> Pine Ridge as well as treated Medicare and Medicaid
> patients at those hospitals.

(Doc. #79, ¶61)(emphasis added).  There are no allegations that

relator, in his subsequent capacity as CEO of the Collier Boulevard

facility, continued to attend the weekly meetings.

Initially, the Court notes that these additional facts could

only relate to such claims as were discussed from January 2007 to

possibly the first week in February 2007 and therefore cannot

relate to any claims resulting from the Masters Golf Scheme.

Nonetheless, the Court finds that none of the personally known

information with respect to January and possibly February 2007

claims bolsters the Complaint or render relator's knowledge any

more reliable.  Indeed, the allegations provide little as to the

nature of the meetings and fail to actually allege that the

billings discussed in the meeting included any Medicare or Medicaid

patients.  Instead, relator simply alleges, without substance, that

billing was discussed in the meeting. Nothing is alleged about

which patients, how many, or if there was a material impact on the

presentments.

Because the Third Amended Complaint fails to plead the 2007 claims with the requisite specificity, and otherwise fails to have an "indica of reliability" to excuse this failure, the 2007 claims in Count I are dismissed with prejudice.

(b)   **Calendar Years 2008 and 2009 Claims:** The June 7, 2010 hospital cost reports covered calendar year 2008, and the May 26, 2010, hospital cost reports covered calendar year 2009.   Both the neurosurgeon allegations and the Masters Golf allegations apply to the 2008 report, but only the neurosurgeon allegations can apply to the 2009 reports.   There are no allegations that the Masters Golf trip was repeated in 2009 and therefore these reports cannot have been false on the basis of golf gratuities.   The allegations concerning both sets of reports, however, suffer from the same lack of particulars as does the 2007 reports.

The Third Amended Complaint fails to specifically identify a single patient referred to defendants for whom services were provided in 2008 or 2009, fails to identify a single referred patient whose services were included in the 2008 or 2009 Hospital Cost Reports, fails to identify the individual or cumulative amounts involved in the claims submitted in reference to referred patients, and fails to identify what defendants gained as a result. Relator's additional allegations relate to his personal knowledge of the underlying schemes, but provide nothing with regard to the defendants' billing practices.   While seeking a civil penalty for

"each violation," not a single violation is identified with specificity. Further, for the reasons set forth above, the Third Amended Complaint offers no indicia of reliability to excuse this failure. Count I is also dismissed with prejudice to the extent that it asserts a claim based upon the submission of the June 7, 2010, and May 26, 2010, Hospital Cost Reports.

**B. Count II - False Statements to Obtain Payment**

Count II alleges that defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government. (Doc. #79, ¶103.) The false records or statements are identified as "the false express or implied certifications of compliance and representations made or caused to be made by Defendants when initially submitting the false claims for interim payments and the false certifications made or caused to be made by Defendant in submitting the cost reports and Requests for Reimbursement." (Id.) Count II further alleges that by virtue of the false records and statements by defendants, the Government suffered unspecified damages. (Id. at ¶104.) Relator seeks treble damages, plus a civil penalty of $5,500 to $11,000 for each violation. (Id.)

Again, two versions of the applicable statute were in effect at the times of the alleged misconduct. Before May 20, 2009, the statute created liability for a person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a

false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2).  Effective May 20, 2009, the statute was amended to provide liability for a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(B).  "Claim" was defined as stated above.

The reason for the change in 2009 to this particular provision of the FCA was in response to the Supreme Court case of <u>Allison Engine Co. v. United States ex rel. Sanders</u>, 553 U.S. 662, 668-69 (2008).  Therein, the Supreme Court held that the earlier provision required a presentment of a false claim to the government. Thereafter, Congress passed the Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, 123 Stat. 1617.  Congress specifically amended the liability standards set forth in § 3729(a)(2), now codified at § 3729(a)(1)(B), in order to remove the presentment requirement imposed by the Supreme Court's decision.

Thus, unlike Count I, a claim brought pursuant to § 3729(a)(1)(B) does not require presentment of a false claim to the government.  To properly state a claim under this section, the relator must show "that (1) the defendant made a false record or statement for the purpose of getting a false claim paid or approved by the government; and (2) the defendant's false record or statements caused the government to actually pay a false claim, either to the defendant itself, or to a third party." <u>Hopper</u>, 588

-25-

F.3d at 1327. This portion of the FCA "imposes liability for false statements *that actually cause the government to pay amounts it does not owe.*" Id. (emphasis added); see also United States ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 242 (3d Cir. 2004).

In his Third Amended Complaint, relator has sufficiently pled that the defendants acted with the purpose of getting a false claim paid with respect to the neurosurgeon scheme. It is alleged that the enumerated purpose of the neurosurgeon scheme was to "entice the neurosurgeons to practice and refer their patients, *including Medicare and Medicaid patients* to the two hospitals." (Doc. #79, ¶69)(emphasis added). In contrast, the "intended purpose" of the Masters Golf scheme remains as pled in the Second Amended Complaint: "to generate business for [d]efendants." (Id. at ¶75.) Relator fails to provide a link between the Masters Golf scheme and the government's decision to pay or approve a false claim. See Hopper, 588 F.3d at 1330. Thus, with respect to the Master's Golf scheme, relator has failed to sufficiently plead that the defendants acted with the intended purpose of getting a false claim paid or approved by the government.

For both the neurosurgeon and the Masters Golf schemes, relator fails to specifically plead any actual payment by the government with the requisite specificity. Again, "[r]elator merely alleges that the Government paid on these claims, but does not provide the dates, amounts, or any other identifying detail of

any of these alleged payments." (Doc. #78, p. 18.) This is insufficient to satisfy Rule 9.

Count II also provides no basis to apply the "indicia of reliability" exception to excuse relator's failure to plead with the required specificity. There are no allegations that suggest that relator has any first hand knowledge as to government payments received by defendants. Accordingly, the motion to dismiss Count II is granted and Count II is dismissed with prejudice.

## C.  Count III

Count III alleges that defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid or decrease an obligation to pay or transmit money or property to the Government. (Doc. #79, ¶106.) The false records or statements are identified as "the false express or implied certifications of compliance and representations made or caused to be made by Defendants when initially submitting the false claims for interim payments and the false certifications made or caused to be made by Defendant in submitting the cost reports and Requests for Reimbursement." (Id.) Count III further alleges that by virtue of the false records and statements by defendants, the Government suffered unspecified damages. (Id. at ¶107.) Relator seeks treble damages, plus a civil penalty of $5,500 to $11,000 for each violation. (Id.)

Again, two versions of the applicable statute were in effect at the times of the alleged misconduct.  Before May 20, 2009, the statute created liability for a person who "knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(7).  Effective May 20, 2009, the statute was amended to provide liability for a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G).   "Claim" was defined as stated above.   No substantive changes are relevant to this case.

This section, commonly referred to as the "reverse-false-claims provision," Matheny, 671 F.3d at 1222, consists of five elements: "(1) a false record or statement and (2) the defendant's knowledge of the falsity; (3) that the defendant made, used, or causes to be made or used a false statement or record; (4) for the purpose to conceal, avoid, or decrease an obligation to pay money to the government; and (5) the materiality of the misrepresentation."  Matheny, 671 F.3d at 1222, citing United States v. Bourseau, 531 F.3d 1159, 1164 (9th Cir. 2008)(collecting

cases). See also <u>United States v. Pemco Aeroplex, Inc.</u>, 195 F.3d 1234, 1236 (11th Cir. 1999).

Like Counts I and II, relator has not made any specific factual allegations to support this cause of action. The Third Amended Complaint fails to specifically allege any monetary obligation by the defendant to the government and has thus failed to plead the fourth element of this claim with the requisite specificity. Relator simply makes conclusory allegations that the defendants owed the government money and attempted to conceal this obligation. This is insufficient under Rule 9. Further, as previously stated, the Complaint otherwise lacks an "indicia of reliability" to excuse relator's pleading failure. Accordingly, Count III is dismissed with prejudice, in its entirety.

**D.    Count IV**

Count IV asserts that the defendants conspired to defraud the government by submitting false or fraudulent claims for reimbursement from the Government for monies to which they were not entitled, in violation of § 3729(a)(3). (Doc. #79, ¶109.) Count IV also alleges that as part of this conspiracy defendants conspired to (1) provide illegal remuneration to physicians and engage in prohibited financial relationships in violation of the Anti-Kickback Statute and/or the Stark Statute, and (2) cause the Government to pay claims for health care services based on false claims and false statements that the services were provided in

compliance with all laws regarding the provision of health care services. (Id.) Count IV further alleges that by virtue of the conspiracy to defraud, the Government suffered unspecified damages. (Id. at ¶110.) Relator seeks treble damages, plus a civil penalty of $5,500 to $11,000 for each violation. (Id.)

To state a claim under this provision, a plaintiff must demonstrate "(1) that the defendant conspired with one or more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim." Id. quoting United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Provident Life & Accident Ins. Co., 721 F. Supp. 1247, 1259 (S.D. Fla. 1989). This section also requires that the relator plead with the specificity required by Fed. R. Civ. P. 9(b). Corsello, 428 F.3d at 1014.

Initially, the Court finds that the Third Amended Complaint lacks any specific facts that support Count IV, and thus fails to meet Rule 9(b). In addition, Count IV does not meet the requirements of Rule 8. Relator provides nothing more than a formulaic recitation of the elements on conspiracy and threadbare legal conclusions. Iqbal, 556 U.S. at 678. There is no factual support as to any actual agreement among the defendants or others to get a false or fraudulent claim paid by the United States or any

specific allegations that put defendants on notice as to the allegations brought against them.  Thus, the motion to dismiss Count IV is granted, and Count IV is dismissed with prejudice.[3]

Accordingly, it is now

**ORDERED**:

1.  Defendants' Joint Motion to Dismiss the Third Amended Complaint (Doc. #84) is **GRANTED**.

2.  The Third Amended Complaint (Doc. #79) is **DISMISSED WITH PREJUDICE**.

3.  The Clerk is directed to enter judgment accordingly, terminate all deadlines and pending motions, and close the file.

**DONE AND ORDERED** at Fort Myers, Florida, this ___19th___ day of March, 2013.

_____
JOHN E. STEELE
United States District Judge

Copies:
Counsel of record

---

[3]Because the Court dismisses all four counts with prejudice, it need not address defendants' assertion that any Counts that arise out of the alleged financial relationships with the neurosurgeons must fail because relator released the defendants in a severance agreement executed on November 8, 2007.  Furthermore, consideration of matters beyond the four corners of the complaint is improper in the context of a motion to dismiss.  Milburn v. United States, 734 F.2d 762 (11th Cir. 1984).